**In the Matter of a Member of the Bar of the Supreme Court of the State of Delaware:**

**Joel D. TENENBAUM, Respondent.**

**No. 294, 2005.**

Supreme Court of Delaware.

Submitted: July 25, 2005.

Decided: Aug. 5, 2005.

Andrea L. Rocanelli, Office of Disciplinary Counsel, Wilmington, DE.

Jeffrey M. Weiner, of Fox Rothschild, L.L.P., Wilmington, DE, for Respondent.

Before HOLLAND, BERGER and JACOBS, Justices.

---

**8.** *Restatement (Second) of Torts,* § 920A (1979).

**9.** *See, also, Lindholm v. Hassan,* 369 F.Supp.2d 1104 (D.S.D.2005).

PER CURIAM:

This is an attorney disciplinary proceeding. The Board on Professional Responsibility (Board) filed a Report and Approval of Stipulation and Joint Recommendation addressing professional misconduct by the respondent, Joel D. Tenenbaum. That Report, without attachments, is appended hereto and incorporated herein by reference. The Office of Disciplinary Counsel (ODC) and Tenenbaum agree that Tenenbaum should be suspended for three years. The Board's factual findings and its recommended sanction are not disputed. Nonetheless, this Court reviews the record independently to determine an appropriate sanction.[1]

### Supreme Court Review

The Supreme Court's authority in matters of lawyer discipline is well settled:

> This Court has the inherent and exclusive authority to discipline members of the Delaware Bar. Sanctions recommended by the Board often aid in our determination, but are not binding on this Court. The sanctions are not designed to be either punitive or penal. The relevant factors to be considered in determining an appropriate sanction are: a) the nature of the duty violated; b) the lawyer's mental state; c) the actual/potential injury caused by the misconduct; and d) the existence of aggravating and mitigating circumstances. In addition, to assure fairness, the sanction must be consistent with prior disciplinary decisions.[2]

After carefully reviewing the record, we conclude that a three year suspension, as recommended by the Board, is the appropriate sanction. The evidence establishes that, during the past 5—10 years, Tenenbaum has sexually harassed female clients and employees, both verbally and physically. His conduct violated former Rule 1.7(b), Rule 1.8(j), Rule 8.4(a) and Rule 8.4(b) of the Delaware Lawyers' Rules of Professional Conduct. Tenenbaum engaged in a pattern of illegal activities that harmed clients and employees. He has substantial experience as a Delaware lawyer, having been admitted to practice in 1972, and he has a prior, though unrelated, disciplinary record. Although the Court recognizes that Tenenbaum has experienced emotional problems and that he has a record of public service, the severity of his misconduct mandates a three-year suspension.

It is hereby ORDERED that:

1) Tenenbaum be prohibited and suspended from engaging in the practice of law for a period of three (3) years, beginning January 5, 2005, the date upon which Tenenbaum ceased the practice of law;

2) During the suspension, Tenenbaum shall conduct no act directly or indirectly constituting the practice of law. Tenenbaum shall not share in any legal fees arising from clients or cases referred by Tenenbaum during the period of suspension to any other lawyer or share in any legal fees earned for services by others during the period of suspension. Tenenbaum shall also be prohibited from having any contact with clients or prospective clients or witnesses or prospective witnesses when acting as a paralegal, legal assistant, or law clerk under the supervision of a member of the Delaware Bar, or otherwise.

3) Tenenbaum shall not contest the imposition of reciprocal discipline in any oth-

---

**1.** *See, In Re Froelich,* 838 A.2d 1117, 1120 (Del.2003).

**2.** *In Re Landis,* 850 A.2d 291, 293 (Del.2004)(Internal quotations and citations omitted.).

er jurisdictions in which he is admitted to practice.

4) Tenenbaum shall pay the costs of these disciplinary proceedings, pursuant to Rule 27 of the Delaware Lawyers' Rules of Disciplinary Procedure.

5) This Opinion and Order shall be disseminated by Disciplinary Counsel in accordance with Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.

APPENDIX

## BOARD ON PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF THE STATE OF DELAWARE

**In the Matter of a Member of the Bar of the Supreme Court of of Delaware:**

JOEL D. TENENBAUM,
Respondent.

*CONFIDENTIAL*

2005 JUl – 1 P 2:27

**Board Case Nos. 48 and 52, 2004 (CONSOLIDATED).**

**REPORT AND APPROVAL OF STIPULATION AND JOINT RECOMMENDATION**

A.   Pending before a panel of the Board on Professional Responsibility ("Board") is a Petition for Discipline filed March 3, 2005 (an Amended and Supplemental Petition was filed March 22, 2005) in Board Case Nos. 48 and 52, 2005 ("Petition"), involving Joel D. Tenenbaum, Esq. ("Respondent"), a member of the Bar of the Supreme Court of the State of Delaware. An Answer to Amended and Supplemental Petition was filed April 1, 2005 ("Answer").

The Petition and Answer are part of the Court's file and are hereby incorporated by reference into the Board's record.

B.   The Office of Disciplinary Counsel ("ODC") and Respondent entered into a pre-hearing Stipulation and Joint Recommendation of Sanction, dated April 13, 2005 ("**Stipulation and Joint Recommendation**"), which was admitted by the Board and designated as **Joint Exhibit "A"** at the hearing, a copy of which is attached to this report and is incorporated herein by reference.

C.   Case No. 48, 2004 is based upon the complaint of a former client that resulted in charges of Respondent's: failures to provide competent representation; charging an unreasonable fee; and numerous violations of professional rules addressing conflicts of interest and material limitations on a lawyer's ability to fully represent a client.

D.   Case No. 52, 2004 is based upon additional information received by ODC subsequent to the complaint resulting in Case No. 48, concerning "multiple additional instances of sexual misconduct on the part of the Respondent, involving clients and members of his office staff" (Amended and Supplemental Petition for Discipline, paragraph 5).

E.   In the Stipulation and Joint Recommendation, Respondent unconditionally admits allegations pertaining to a female client Ann Arbor [1]. Respondent thus admitted that during his representation of Ann Arbor in 1998, he engaged in sexual relations with her and did not bill her fully for his legal services and now admits that this representation was materially limited by his personal interest in having sexual relations with her and that the conduct violated former Rule 1.7(b) of the Dela-

---

1.   The names of respondent's clients and office staff are pseudonyms selected by the ODC.

ware Lawyers' Rules of Professional Conduct.

**F.** The balance of the facts and violations were not unconditionally admitted by Respondent; rather, Respondent did not contest that the ODC would prove by clear and convincing evidence the balance of the facts and violations set forth in the Stipulation and Joint Recommendation, Section IV. At the hearing, the ODC and Respondent's counsel noted that the precedent for the use of a Respondent's "no contest" to ODC's presentation of clear and convincing evidence is: *In the Matter of a Member of the Bar of the Supreme Court of Delaware: William L. Garratt Jr.* (Board Case # 32, 2002; Supreme Court No. 456, 2003). Respondent's counsel noted that in the *Garratt* case, the Board's found that the ODC had presented clear and convincing evidence of the violations alleged in the counts of the Petition for Discipline, and that the Respondent did not file any objections. Respondent's counsel further noted that although the "no contest aspect of it did not become a prominent part of the Supreme Court's three or four page Order from that case", it was set forth in the transcript of the hearing and the Supreme Court accepted the Board's recommendation in that case.[2]

**G.** At the outset of the hearing, Respondent's counsel noted that Respondent had "voluntarily waived his right to be present for the first five witnesses". The Respondent was in fact absent from the courtroom for the testimony of the first four witnesses, Jane Jones, Faye Franklin, Sarah Smith and Heather Holmes. Respondent was present for the testimony of the fifth witness, Martha Miller.

**H.** Also at the outset of the hearing, the ODC moved to dismiss all remaining counts in the Amended and Supplemental Petition for Discipline and the Board withheld its decision on that motion, but includes its decision on that motion later in this report.

**I.** The Board heard the testimony of the afore-named five witnesses, as well as the testimony of Respondent, Joel D. Tenenbaum.

**J.** The Board reviewed the agreed exhibits, listed in Section II of the Stipulation and Joint Recommendation, attached to the Stipulation as Exhibits 1, 2 (regarding prior disciplinary actions) and 3 (Report of the Professional Renewal Center dated February 24, 2005), all part of Exhibit "A" to this Report.

**K.** The admitted facts and admitted violation (Section III to the Stipulation and Joint Recommendation) and the facts and violations that Respondent did not contest (Section IV to the Stipula-

---

**2.** The Board reviewed both the Board Report and the Supreme Court's decision in the *Garrett* case. The Board report contained the Board's express finding that the facts alleged in the Petition for Discipline were "established by clear and convincing evidence through the un-refuted testimony of Joseph M. McCollough and Martin Zukoff, CPA, auditors for LFCP." The Board further found that "the violations alleged in Counts one though nine, inclusive, in the Petition for Discipline were established by clear and convincing evidence". The Supreme Court's Decision included its statement that "we accept the Board's finding of fact". The Panel of the Board in the instant case questions whether the Supreme Court, in adopting the Board's finding of fact and violations by clear and convincing evidence through un-refuted testimony establishes a "no contest" rule. As such, this Board reports its own findings (later in this report), while noting here that it has no objection to the procedure by which facts alleged by ODC and violations of the Rules of Professional Conduct may be established by a Respondent's concession that ODC can prove such facts and violations by clear and convincing evidence.

tion and Joint Recommendation) are restated hereafter.

## III. ADMITTED FACTS and ADMITTED VIOLATION

The Respondent unconditionally admits the following:

*Ann Arbor*

The Respondent represented a female client, Ann Arbor. Over three or four months during his representation of her in 1998, the Respondent engaged in sexual relations with Arbor. The Respondent did not fully bill Arbor for his legal services. By representing Arbor when his representation was materially limited by his personal interest in having sexual relations with her, the Respondent violated former Rule 1.7(b) of the Delaware Lawyers' Rules of Professional Conduct ("Rules"). (Count 20)

## IV. NO CONTEST REGARDING FACTS and VIOLATIONS

The Respondent does not contest that the ODC will prove by clear and convincing evidence the following facts and violations:

*Jane Jones*

Jane Jones retained the Respondent on May 6, 2003 to represent her in a child support and visitation matter. In the course of the Respondent's representation of Jones, he made inappropriate statements, inquiries, and gestures on two separate occasions.

On April 8, 2004:

- The Respondent said to Jones, "I cannot believe a woman with your looks and personality isn't dating";
- The Respondent asked Jones when they would be "going away together";

- The Respondent asked Jones questions regarding impotence drugs such as Viagra [Jones is a Registered Nurse], including "What would you do for a man who had a four hour erection?" and
- The Respondent made an open-arm gesture and refused to let Jones leave his office until she hugged him.

On April 26, 2004, the Respondent asked Jones, "When are you going to have sex with me?"

Rule 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so or do so through the acts of another." Effective July 1, 2003, Rule 1.8(j) provides that "[a] lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced." By engaging in the course of conduct described herein with Jones, the Respondent attempted to initiate sexual relations with his client, in violation of Rule 8.4(a). (Count 38)

*Faye Franklin*

Faye Franklin was represented by the Respondent in connection with a domestic relations matter from August 2002 through 2004. Throughout the representation, the Respondent acted inappropriately. The Respondent hugged and kissed Franklin on several occasions, and wanted Franklin to sit next to him on the couch in his office. While on the couch, the Respondent would stroke Franklin's hair. The Respondent wanted Franklin to put her head on his shoulder. On one occasion, the Respondent took Franklin's hand and forced her to touch him in his genital area (outside of his pants); he had an erection; he said, "Let me show you how much I missed you" or "Let me show you how glad I am to see you."

Franklin felt very uncomfortable with the Respondent's conduct. At times, Franklin felt that the Respondent acted aggressively to "try to break me down," "to break my spirit" so that he could then "comfort" Franklin with hugs, kisses and touching. Franklin also felt that the Respondent purposely "manipulated" her. Franklin "feared what would happen if I did not play the game."

Rule 8.4(b) provides that "[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." 11 *Del. C.'* 763(2) states that "[a] person is guilty of sexual harassment when: ... (2) [t]he person suggests, solicits, requests, commands, importunes or otherwise attempts to induce another person to have sexual contact or sexual intercourse or unlawful sexual penetration with the actor, knowing that the actor is thereby likely to cause annoyance, offense or alarm to that person." Pursuant to 11 *Del. C.'* 763, sexual harassment is an unclassified misdemeanor in the State of Delaware. 11 *Del. C.'* 601(a)(1) states that "[a] person is guilty of offensive touching when the person: (1) [i]ntentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person." Pursuant to 11 *Del. C.* '601(c), any violation of paragraph (a)(1) is an unclassified misdemeanor, unless the victim falls within one of several specified categories. By engaging in the course of conduct described herein with Franklin, the Respondent sexually harassed and offensively touched Franklin in violation of Rule 8.4(b). (Count 70)

*Sarah Smith*

Sarah Smith is the daughter of the Jamaican housekeeper and child care provid-

er who worked in the Respondent's household for many years. Smith has always called the Respondent "Uncle Joel." She called him "Uncle Joel" throughout his representation of her. Smith retained the Respondent to represent her concerning divorce and child custody and support. Smith's husband had recently returned from Iraq and had threatened to kill Smith on three occasions. Smith retained the Respondent in October 2003 and paid the firm $3,000 as a retainer fee. The divorce was uncontested. The matter did not involve any significant property division issues. It was necessary to seek Protection From Abuse order[s]. Smith was quite young and struggling financially; she had an abusive husband and a newborn son.

The Respondent started by giving Smith a peck on the check, and occasionally hugging her. The Respondent's advances increased in frequency and he became more and more aggressive. He started scheduling meetings with Smith after hours. He kissed her on the mouth, groping her, touching and squeezing her bottom, and putting his tongue in her mouth. The first time he put his tongue in her mouth, he explained to her that it was just a "friendly kiss" and then proceeded to get on top of her and grope and squeeze her bottom. The Respondent referred to Smith's newborn son as a "lucky boy" because he was being breast fed. His comments and suggestions became more explicit. The Respondent would sit next to her on the couch and would "be all over me."

At the second PFA hearing, Smith was very pleased with the outcome. She was so happy that she went over to hug the Respondent. He pushed her away and said, "Oh no, not here."

Eventually, Smith insisted on meeting the Respondent during regular office hours. She recites two incidents that occurred during business hours. On one

occasion, Smith and the Respondent were sitting on the couch in the Respondent's office. He was all over her and groping her. The second incident occurred on a day Smith was meeting with Ms. White to review documents in an upstairs conference room to prepare a financial document commonly referred to as "the 52D." Smith describes it as a small conference room with a round table and two or three chairs. The Respondent came in and sat down, and asked Ms. White to go downstairs to get documents from the file. When Ms. White left the room and they were alone, the Respondent pressed Smith up against the conference room table, grabbed her head, and forced his tongue into her mouth. He was pushing his body up against her body, forcing himself. "When he was done," he took her hand and forced her to touch him in his genital area (outside of his pants), and said, "You see what you do to me."

Smith was afraid to tell him to stop because whenever she resisted him, the Respondent would refuse to address the legal issues of her case. Smith was fairly desperate to retain custody of her son, and she felt that she needed the Respondent's assistance to accomplish this. She says that she tried to tell him "no" on numerous occasions but she came to feel that she had no choice. When she rebuffed him, the Respondent became aloof, would not focus on her case and acted as if he did not care about her case. Also, she felt he was powerful, that he knew all the judges and the lawyers and that he would retaliate against her.

During a meeting in his office, Smith discussed her legal bills with the Respondent, expressing concern about owing so much money and being unable to pay the bill. The Respondent told Smith to have a seat on the couch. The Respondent sat down very close to her and placed his hand on her leg. Smith explained to the Respondent that she was at a disadvantage because she was poor and that her son was all she had. As he was sitting close and rubbing her thigh with his hand, the Respondent replied, "We can work out the bill." Smith believes that the Respondent would have reduced or eliminated the bill if she had agreed to have sex with him. Smith states, "[The Respondent's] advances made me feel cheap."

Effective July 1, 2003, Rule 1.8(j) provides that "[a] lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced." By engaging in the physical conduct alleged herein with Smith during the course of his representation of her, the Respondent violated Rule 1.8(j). (Count 22)

*Heather Holmes*

Heather Holmes is a legal secretary at the Respondent's law firm. She worked for the Respondent from 1990 or 1991 until 1997. Thereafter, Holmes was reassigned within the firm. During the period she worked for the Respondent, he made inappropriate advances toward her including touching her shoulders, hugging her, and kissing her on the cheek. Occasionally, the Respondent made "out of line" comments about how nice he thought Holmes' legs were and how he noticed she had lost weight. He would push her into positions so that she could not move and would poke and tickle her.

One day, when Holmes had just begun working for him, the Respondent brought her into his office and told her, "I really like you. You are more than just a secretary to me." As time went on, the Respondent proceeded to make Holmes feel more and more uncomfortable; however, Holmes was apprehensive to notify anyone

about what was going on for fear of losing her job and upsetting her husband. On one occasion, the Respondent went into Holmes' office, came up behind her and bit her on the neck while she was working at her desk. At this point, Holmes informed the office manager who transferred her to another attorney. She no longer worked for the Respondent.

During late 2004 after the Respondent returned to the office with limitations on his conduct, whenever Holmes saw the Respondent, he would put his hands behind his back and say, "I'm not touching you." This made Holmes think that the Respondent was thinking of touching her and she felt violated.

Rule 8.4(b) provides that "[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." 11 *Del. C.* '763(2) states that "[a] person is guilty of sexual harassment when: . . . (2) [t]he person suggests, solicits, requests, commands, importunes or otherwise attempts to induce another person to have sexual contact or sexual intercourse or unlawful sexual penetration with the actor, knowing that the actor is thereby likely to cause annoyance, offense or alarm to that person." Pursuant to 11 *Del. C.* '763, sexual harassment is an unclassified misdemeanor in the State of Delaware. 11 *Del. C.* '601(a)(1) states that "[a] person is guilty of offensive touching when the person: (1) [i]ntentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person." Pursuant to 11 *Del. C.* '601(c), any violation of paragraph (a)(1) is an unclassified misdemeanor, unless the victim falls within one of several specified categories. By engaging in the course of

conduct described herein with Holmes, the Respondent sexually harassed and offensively touched Holmes in violation of Rule 8.4(b). (Count 54)

*Martha Miller*

Martha Miller is a part-time paralegal at the Respondent's law firm. She was hired in August 2003 to work with lawyers David C. Gagne, Esquire and F. Edmund Lynch, Esquire. The first time that Miller went into the Respondent's office, she overheard a conversation that he was having with a female client via speaker phone. The client told the Respondent, "He rubs me the wrong way" to which the Respondent replied, "I wouldn't mind if you did that to me." He then repeated his statement while looking directly at Miller and smiling as he said it.

After she had been working at the firm for a short period of time, the Respondent asked her to work on a major case to prepare it for trial. The Respondent made Miller accompany him to the trial. The Respondent's work demands on Miller increased and he put increasing pressure on her. It eventually reached the point that it was difficult for her to continue working for Gagne and Lynch. As the work demands from the Respondent became more intense, his conduct became more aggressive. He started with hugs that he knew made her uncomfortable. The physical contact also included holding her forcefully for periods of time. On at least one occasion, the Respondent kissed her on the mouth. Miller became more and more uncomfortable. She gained 20 pounds and started hiding from the Respondent.

When Miller started to avoid the Respondent and hide from him, he sought her out and demanded that she come to his office. On several occasions, he said to her, "Who signs your paycheck? When I call, you come. I don't want to have this conversation again." He also told Miller

on numerous occasions, "You work for me" and that she was to stop whatever it was that she was doing when he called for her and "come NOW to my office." On one of the days when Miller hid from the Respondent so that she did not have to face him, the Respondent found her and said, "Don't you hide from me. You stand here. I told you to organize the file NOW." The Respondent continued to remind Miller that she worked for him by making such statements as, "Who signs your paychecks? You don't work for David, you don't work for Ed—you work for ME."

Whenever the Respondent would call her to his office, Miller would be sure to bring a file so that she could hold it against herself as a barrier. She also tried to stand at his office door without going in. Miller hid in the bathroom many times, crying and shaking. Eventually, Miller told Gagne that she was uncomfortable working with the Respondent but did not tell him why. Miller told the office manager that she did not want to work for the Respondent. Eventually, Miller told Gagne about the kiss.

Rule 8.4(b) provides that "[a] lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." 11 *Del. C.* '763(2) states that "[a] person is guilty of sexual harassment when: ... (2) [t]he person suggests, solicits, requests, commands, importunes or otherwise attempts to induce another person to have sexual contact or sexual intercourse or unlawful sexual penetration with the actor, knowing that the actor is thereby likely to cause annoyance, offense or alarm to that person." Pursuant to 11 *Del. C.* '763, sexual harassment is an unclassified misdemeanor in the State of Delaware. 11 *Del. C.* '601(a)(1) states that "[a] person is guilty of offensive touching when the person: (1) [i]ntentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person." Pursuant to 11 *Del. C.* '601(c), any violation of paragraph (a)(1) is an unclassified misdemeanor, unless the victim falls within one of several specified categories. By engaging in the course of conduct described herein with Miller, the Respondent sexually harassed and offensively touched Miller in violation of Rule 8.4(b). (Count 52)

---

**L.** Mr. Tenenbaum testified about his experience as a Delaware attorney, his legal work for various law-related associations and his public and community service throughout his legal career (Hearing Transcript, pages 155–167; hereafter "T"). He testified about his prior heart attack and the prescription drugs he has taken or is taking currently (T–167–171). He testified about his consultations with a psychiatrist, Dr. Dennis Donnelly, over the past three or four years for treatment of "major depression and boundary issues" (T–173). Respondent stated his understanding that "boundary issues" is "saying or doing things that can be misinterpreted by other people, misinterpreted by other people as crossing the line" (T–171–172). He testified about his "hugging" tendencies and confirmed that his hugging was not intended in a sexual way (T–174, 175), but acknowledged that because of his boundary issues, the huggings "could very well have been misinterpreted" (T–175).

He next testified as to the examinations, testing and therapy that he undertook through the Professional Renewal Center, the report of which appears as Exhibit 3 to the Stipulation and Joint Recommendation (T–176–177). He testified briefly regarding the sexual relationship he had with a

client during the course of his representation in 1998, noting that this came to light as a result of his admission of this relationship, and not as a result of a complaint to the ODC (T–177–178). He acknowledged that this conduct was wrongful (*"malum prohibitum and malum in se"*) even prior to the Rule change (T–177–178) [3]. Lastly, he testified that he was "woefully embarrassed" and "horribly sorry" for the matters leading to these proceedings, ending his testimony with his statement that "this is not the note upon which I would have liked to have ended my career" (T–178). In response to further questions from the Board, Respondent confirmed that he was not currently practicing law in the State of Delaware; that he was not actively practicing in either of the two other jurisdictions in which he is licensed to practice (Pennsylvania and New York) and that he intended to take whatever steps were necessary to confirm his inactive status or voluntarily retirement in all jurisdictions (T–179–182).

**M.** Following Respondent's testimony, both Ms. Rocanelli and Mr. Weiner spoke in support of the Board's adoption of the recommended sanction.

**N.** In reaching its findings and recommendations regarding the appropriate sanction, the Board carefully considered the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"), and the factors considered under the Standards:

1. What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system or the profession?)

The foregoing admitted facts, the uncontested testimony and the admitted and un-contested violations together substantiate that the ethical duties Respondent violated were those owed both to his clients and to the legal system (and thus the profession).

2. What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly or negligently?)

Ms. Rocanelli, on behalf of the ODC, noted her position that the record established the Respondent's intentional conduct (T–186). Respondent's counsel did not argue otherwise. Although Respondent offered some testimony to negate that certain of his conduct was intended to be sexual in nature, the Board finds that the Respondent's mental state is best characterized as intentional.

3. What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?)

In reviewing the extent of the actual or potential injury caused by the lawyer's misconduct, the Board agrees with the ODC that the record established that Respondent's conduct resulted in actual harm to some, if not all of the testifying witnesses.

In discussing the appropriate sanction, the ODC made reference to Section 5.12 of the *ABA Standards for Imposing Lawyers Sanctions* (1991; as amended 1992; the "Standards"). Ms. Rocanelli noted in her closing remarks: "Under Standard 5.12, a suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in 5.11, and those elements address particular types of conduct which are not present here, but which conduct seriously adversely reflects on a lawyer's fitness to

---

**3.** Respondent admitted that this conduct violated former Rule 1.7(b); the new Rule re-    ferred to is Rule 1.8(j).

practice" (T–187). Ms. Rocanelli further noted that "4.32 states that a suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose that conflict to a client, the possible effect of the conflict, and as a result, injury or potential injury is caused" (T–188). Lastly, Ms. Rocanelli confirmed that Respondent and the ODC agreed upon suspension as the appropriate result in this case, in the interests of the witnesses and the Respondent's own interests as well (T–189).

The Board is of the opinion that Standard 4.32 is directly applicable to this case, and with the stipulation of the Respondent that suspension is appropriate, provides the bases for the Board's finding that a suspension is the appropriate initial sanction.

**O.** After making this initial determination of the appropriate sanction, The Board then gave consideration to aggravating and mitigating circumstances that could lead to a different sanction. **The aggravating and mitigating factors stipulated to by Respondent and ODC, and adopted by the Board, are restated herein.**

### Aggravating Factors [4]

The ODC and the Respondent stipulate that the ODC will prove by clear and convincing evidence the following aggravating factors:

(1) The Respondent has engaged in a pattern of sexual misconduct involving clients and members of his office staff [*Standard* § 9.22(c)];

---

**4.** The aggravating and mitigating factors addressed in this Report are derived from the *ABA Standards for Imposing Lawyer Sanctions*

(2) The Respondent acted with the selfish motive [*Standard* § 9.22(b)];

(3) The victims of the Respondent's misconduct were vulnerable, due to each of their status as his clients in domestic relations matters or employees of his law firm and/or due to other personal circumstances [*Standard* § 9.22(h)];

(4) The Respondent's misconduct in the pending matters consists of multiple offenses [*Standard* § 9.22(d)]; and

(5) The Respondent engaged in illegal conduct, consisting of sexual harassment and offensive touching of clients and members of his office staff [*Standard* § 9.22(k)].

The ODC and the Respondent stipulate that the following aggravating factors exist in this disciplinary matter:

(1) The Respondent has substantial experience in the practice of law, having been admitted to the Delaware Bar in 1972 [*Standard* § 9.22(i)]; and

(2) The Respondent has a prior disciplinary record, consisting of two private admonitions, as follows [*Standard* § 9.22(a)]:

(a) In 1995, the Respondent was privately admonished for violation of Rule 3.3(a)(2) (knowingly failing to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client) and Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice), when in a Family Court matter he failed to disclose to the Court that his client had encumbered certain property with notes secured by mortgages); and

(b) In 1984, the Respondent was privately admonished for violation of Canon

§§ 9.2 and 9.3 (1991) (as amended Feb. 1992) (the "*Standards*").

1, DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), and DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), based upon findings that while testifying as a witness in support of his claim for fees, he knowingly misrepresented that records-in addition to those produced and introduced into evidence-indicating the amount of time and services rendered to the client were destroyed as a result of a fire in the building in which his offices were located. (*See* Joint Exhibits 1 and 2.)

### Mitigating Factors

The ODC and the Respondent stipulate that the following mitigating factors exist in this disciplinary matter:

(1) The Respondent's record of substantial public and community service throughout the course of his legal career, such as leadership roles within the American Bar Association and the Delaware State Bar Association, and volunteering for many service organizations including Catholic Charities, the Office of Child Advocate, Family Court and providing other *pro bono* legal services [*Standard* § 9.22(g)];

(2) The Respondent has experienced personal and emotional problems, including diagnoses of Major Depressive Disorder, Recurrent, Moderate; Dysthymic Disorder; and Personality Disorder NOS with Narcissistic and Histrionic Features (*see* Joint Exhibit 3) [*Standard* § 9.32(c)]; and

(3) The Respondent has not been previously disciplined for sexual misconduct involving clients or office staff [*Standard* § 9.32(a)].

---

**P.** The Board agrees with the proposed sanction. Although the Board has not been presented with any information regarding criminal charges against Respondent, it generally agrees with the ODC that a three year suspension is consistent with the conduct presented in prior Delaware cases: *In Re: Christie*, 574 A.2d 845 (Del.Supr., 1990); and *In Re: Suddard*, 670 A.2d 1341 (Del.Supr.1995).

**Q.** For the foregoing reasons, the Board agrees with the proposed sanction contained in the Stipulation and Joint Recommendation, with the conditions as proposed. The Board grants ODC's motion to dismiss all remaining counts in the Amended and Supplemental Petition for Discipline. The Board's Order and Recommendation to the Delaware Supreme Court follows.

WHEREFORE, IT IS HEREBY ORDERED:

### Three Year Suspension (With Conditions).

1. Respondent shall be suspended from engaging in the practice of law for a period of three years.

2. Respondent shall pay the ODC's costs in this disciplinary proceeding.

3. Respondent shall not engage in the practice of law during the pendency of this disciplinary proceeding.

4. Respondent shall not contest the imposition of reciprocal discipline in any other jurisdictions in which he is admitted to practice.

5. During the period of suspension, Respondent shall not: (a) share in any legal fees arising from clients or cases referred by Respondent during the period of suspension to any other attorney, or (b) share in any legal fees earned for services by others during such period of suspension.

The Board hereby considers all issues surrounding this disciplinary matter to be resolved by this Order, subject to review by the Delaware Supreme Court pursuant to Procedural Rule 9(e).

**BOARD ON PROFESSIONAL RESPONSIBILITY**

/s/ Robert G. Gibbs
Robert G. Gibbs, Esq., Panel Chair

/s/ Mark J. Reardon
Mark Reardon, Esq., Panel Member